IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| ELYESE ANDERSON, | ) | |
| RUSSELL AYERS and CODY AYERS, | ) | |
| MICHAEL BOUNDS, | ) | |
| JAY BRAUN and JOSEPH BRAUN, | ) | Case No. 4:06CV00919HEA |
| CATHERINE BROWN, | ) | |
| DAVID and BECKY CHRISTENSEN, and | ) | **JURY TRIAL DEMANDED** |
|     JENNA CHRISTENSEN, | ) | |
| JAMES and CHERYL CRARY, and | ) | |
|     SAMANTHA CRARY, | ) | |
| VICKI SOWLE, | ) | |
| MORIAH GARZA, | ) | |
| BRAD HAMPTON, | ) | |
| TERRY and KATHERINE HANS, and | ) | |
|     TIMOTHY HANS, | ) | |
| CAROLYN HILDEBRAND and NICOLE WARD, | ) | |
| DONNIE and CAROLYN JOHNS, and | ) | |
|     JONATHAN JOHNS, | ) | |
| LEIGHA LAWSON, | ) | |
| TONI LEWIS and TONIECE SIMS, | ) | |
| DIANE MAMELL, | ) | |
| NICHOLAS MARTINEZ and NICOLE MARTINEZ, | ) | |
| SUSAN McCOY and CHELSEA GRINNALL, | ) | |
| PAULA McKINNEY, | ) | |
| DOUGLAS O'NEILL, | ) | |
| JULIE ROBERTS-COLE and | ) | |
|     KAREN ROBERTS TORRESS, | ) | |
| JANE WHITE, | ) | |
| HEARTLAND ACADEMY COMMUNITY CHURCH, | ) | |
|     a Missouri Not-for-Profit Corporation, and | ) | |
| CNS INTERNATIONAL MINISTRIES, INC., | ) | |
|     a Missouri Not-for-Profit Corporation, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
|     v. | ) | |
| | ) | |
| MICHAEL WADDLE, in his individual and | ) | |
| official capacities, | ) | |
| JEFF HALL, in his individual and official capacities, | ) | |
| | ) | |
| CINDY AYERS, in her individual and official capacities, | ) | |

DANA MARTIN, in her individual and official capacities, )
                                                         )
DENISE CROSS, in her individual and official capacities, )
                                                         )
JERRIE JACOBS-KENNER, in her individual                  )
    and official capacities,                             )
                                                         )
CHRISTINE WHITE, in her individual                       )
    and official capacities,                             )
                                                         )
DONNA ROHRBACH, in her individual                        )
    and official capacities,                             )
                                                         )
PAM McGOWAN, in her individual                           )
    and official capacities,                             )
                                                         )
JAMES HARRISON, in his individual                        )
    and official capacities,                             )
                                                         )
MAC ABERNATHY, in his individual                         )
    and official capacities, and                         )
                                                         )
RICHARD ENGELHARDT, in his individual                    )
    and official capacities,                             )
                                                         )
              Defendants.                                )

## SECOND AMENDED COMPLAINT

Plaintiffs state:

### Nature of Case

1.     In this action, plaintiffs seek redress against defendants, who individually and in
concert with each other have, in bad faith, engaged in a systematic, persistent and continuous
campaign of harassment and intimidation against Heartland Academy Community Church and
CNS International Ministries, Inc. ("Heartland"), its students and their families, faculty and staff
(collectively, the "Heartland community"), to interfere with, restrict, damage and if possible,
destroy, the Heartland community, in violation of the constitutional rights of Heartland, its

students and their families, faculty and staff.  The constitutional rights that have been violated

include, but are not limited to, the right to be free of unreasonable seizures, and family integrity,

religious freedom, free speech, expressive association, private association, and procedural and

substantive due process rights.   The supplemental state law claims include, but are not limited

to, abuse of process, malicious prosecution, invasion of privacy, false imprisonment and

defamation.

**Parties**

2.       Plaintiffs Heartland Academy Community Church and CNS International

Ministries, Inc. ("Heartland"), are Missouri not-for-profit corporations in good standing, located

in the Eastern District of Missouri.

3.       Plaintiff parents of students who attend or prior to October 30, 2001 attended

Heartland, and current or former students who are plaintiffs, are as follows:

| Parents | Students |
|---|---|
| Elyese Anderson | |
| Russell Ayers | Cody Ayers |
| | Michael Bounds |
| Jay Braun | Joseph Braun |
| Catherine Brown | |
| David and Becky Christensen | Jenna Christensen |
| James and Cheryl Crary | Samantha Crary |
| Vicki Sowle | |
| | Moriah Garza |
| Brad Hampton | |
| Terry and Katherine Hans | Timothy Hans |
| Carolyn Hildebrand | Nicole Ward |

| | |
|---|---|
| Donnie and Carolyn Johns | Jonathan Johns |
| | Leigha Lawson |
| Toni Lewis | Toniece Sims |
| Diane Mamell | |
| Nicholas Martinez | Nicole Martinez |
| Susan McCoy | Chelsea Grinnall |
| Paula McKinney | |
| Douglas O'Neill | |
| Julie Roberts-Cole | Karen Roberts Torress |
| Jane White | |

4.      Defendant Michael Waddle was, at all times relevant hereto, Chief Juvenile Officer for the Second Judicial Circuit in the State of Missouri, which contains Lewis, Knox and Adair Counties.  At all times relevant to this complaint, he acted under color of law.

5.      Defendant Jeff Hall is, and at all times relevant hereto was, Deputy Juvenile Officer for the Second Judicial Circuit in the State of Missouri.  At all times relevant to this complaint, he acted under color of law.

6.      Defendant Cindy Kennel Ayers is, and at all times relevant hereto was, Chief Juvenile Officer for the Forty-First Judicial Circuit in the State of Missouri, which contains Shelby and Macon Counties.  At all times relevant to this complaint, she acted under color of law.

7.      Defendant Dana Martin, was at all times relevant hereto, director of the Missouri Department of Social Services.  At all times relevant to this complaint, she acted under color of law.

8.    Defendants who were employed by Division of Family Services ("DFS"), renamed in 2003 as the "Children's Division," a division of the Missouri Department of Social Services, are:

Denise Cross,

Jerrie Jacobs-Kenner,

Christine White,

Donna Rohrbach,

Pam McGowan,

James Harrison,

Mac Abernathy, and

Richard Engelhardt.

At all times relevant to this complaint, they acted under color of law.

9.    All defendants are sued in their individual capacities.  To the extent injunctive or declaratory relief is sought, all defendants are also sued in their official capacities.

**Jurisdiction and Venue**

10.    Jurisdiction is conferred on the Court, for the resolution of the federal and constitutional questions presented, by 28 U.S.C. §§ 1331 and 1343.  Redress for federal constitutional violations is sought pursuant to 42 U.S.C. § 1983.

11.    Redress for state law violations is sought under the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202 and by Rule 57, Fed. R. Civ. P.

12.     Venue is proper in the Eastern District of Missouri because a substantial part of the events giving rise to this claim occurred within this district.  Venue is proper in the Eastern Division of the Eastern District of Missouri because defendants Pam McGowan and Richard Engelhardt reside within it, while other defendants do not.

## Facts Pertaining to All Counts

**Summary of Case**

13.     Heartland Academy Community Church is a ten-year-old Christian ministry consisting of, among other things, a church, Heartland Children's Homes and Heartland Recovery Center.  Heartland Academy Community Church is affiliated with CNS International Ministries, Inc.  CNS International Ministries, Inc. consists of, among other things, an elementary and secondary school that does business under the name Heartland Christian Academy.  In 2001, approximately 220 students attended school at Heartland Christian Academy, and approximately 120 of them were boarding students.  The approximately 100 remaining students resided with their families at Heartland or in the neighboring communities. In addition to tending to their studies, a substantial number of Heartland students engage in part-time work in operations run by Heartland's affiliates, which operations include, but are not limited to, a dairy, restaurants which are open to the public, a small hotel, and the boarding school itself.

14.     Heartland is an openly faith-based institution, which seeks to minister particularly to the needs of young people who have behavioral difficulties or drug or alcohol dependencies. As it does with its entire program, Heartland addresses these difficulties and dependencies with a comprehensive and holistic method, which is driven as completely as possible by the sincerely-

held Christian religious beliefs of the faculty and staff at Heartland.  In this effort, Heartland has the support of the families who have placed their children there.

15.    In or before April, 2001, the defendants individually, in concert with each other, and in concert with other persons, began a systematic, persistent and continuous campaign of bad-faith harassment and intimidation against Heartland, its students and their families, faculty and staff (collectively, the "Heartland community"), to disrupt, damage and, if possible, destroy the Heartland community, in violation of the constitutional rights of Heartland, its students and their families, faculty and staff.

16.    Beginning in May, 2001, the defendants began unlawfully seizing and detaining Heartland boarding students, and also began to unlawfully threaten the seizure of Heartland boarding students and to threaten their parents with loss of parental rights and criminal action should they keep their children at Heartland, for the purpose of disrupting, damaging and destroying the Heartland community.  None of the aforesaid students was ever suspected of or charged with any wrongdoing.

17.    On October 30, 2001, the conspiracy among the defendants culminated in the unlawful seizure and detention of approximately 115 Heartland students, including plaintiff students and children of the plaintiff parents (except for plaintiff Elyese Anderson, who was forbidden by defendant Waddle, acting in concert with the other defendants, from returning her child to Heartland approximately one week earlier).  While the children were in custody, and before they were released to their parents, defendants Waddle, Hall and Ayers threatened plaintiff parents and their children that if the children were returned to Heartland they would again be removed, the parents would face loss of their parental rights, the children would be placed in the custody of others, and the parents would face charges of criminal neglect.  Prior to

having their children released to them, many of the parents (including some of the plaintiff parents) were required to promise not to return their children to Heartland. None of the plaintiff students or children of the plaintiff parents had been abused and none was in imminent danger of being abused, such that their being removed from Heartland would be justified.

**History of Heartland**

18.     Charles Sharpe, chairman of the board of Ozark National Life Insurance Company of Kansas City, Missouri, is the founder of Heartland, the president of CNS and the pastor of the Heartland Academy Community Church. His wife, Laurie Sharpe, also works in the administration of the Heartland program. Heartland has been in operation since 1996. The program began when Mr. Sharpe sought to reach out to the spiritual needs of the community that had formed around Sharpe Land & Cattle Company, a farm operated by Mr. Sharpe in Lewis County, the area where he grew up in Northeast Missouri. Mr. Sharpe came to realize that problems of alcohol and drug abuse and violent behaviors are not limited to cities. He therefore began a church and a recovery program for adults. It became evident that the people in the recovery program needed a residential setting, and therefore someone to take care of their children while they were in the program. It then became apparent to Mr. Sharpe that many of the children of these troubled parents also had problems that needed treatment. These concerns were the genesis of the Heartland youth homes.

19.     In 2001, Heartland had parts of its operations in three counties. The boys' dormitory and men's recovery center were located in Lewis County, the girls' dormitory in Knox County, and group homes (including Charles and Laurie Sharpe's group home for approximately fourteen students) and the school itself in Shelby County. The Sharpe Land & Cattle Company

was located in Lewis County.   The members of Heartland Academy Community Church worshipped in the gymnasium of the school.

20.     Prior to October 30, 2001, Heartland had an enrollment of approximately 220 students, of whom approximately 120 were boarding, or "program," students.  Heartland's students came from all over the United States, as well as abroad, including Mexico, Eastern Europe and Asia.  Most boarding students were placed in Heartland by parents or juvenile officials who could no longer control them.  The youth ranged from the moderately behaviorally defiant to the profoundly psychologically disturbed.  Many of the students had been expelled from the public school system and alternative placements had failed to help them.

21.     Most of Heartland's operating costs have been funded through donations from the Sharpes and companies owned by them, who have contributed in excess of $70 million dollars to date.  The school receives no government funding from any source.

22.     The mission of Heartland is to provide a therapeutic environment in which troubled children are placed in a structured family environment and are taught to manage their behavior; it is a Christ-centered environment designed to help those children become productive citizens.  The school's primary objective is to let the children know that the staff love them and that they in turn need to love others instead of succumbing to hate and anger.

23.     Heartland uses corporal punishment as a method of discipline, which is legal under Missouri law.  Mo. Rev. Stat. § 210.110(1) (discipline, including spanking, administered in a reasonable manner, shall not be construed to be abuse).  The corporal punishment is administered in the form of a limited number of swats applied with a paddle to a student's clothed behind, as the student stands with his or her hands placed on the back of a chair.  Parents are provided handbooks and manuals before their children are enrolled which describe when

corporal punishment may be administered.  Heartland employs corporal discipline, or "swats," as a last resort.

**Pre-2001 History of DFS Investigations at Heartland**

24.     Between its founding and early 2001, Heartland generally maintained a good relationship with law enforcement, juvenile and Division of Family Services ("DFS") officials in Lewis, Knox and Shelby Counties, as well as the surrounding area.  Occasional problems occurred with some of the youth in the program (runaways, car thefts, etc.), but there were no serious injuries resulting from discipline to any of the children in the program, no allegations of sexual abuse or any of the other problems that plague similar programs dealing with major juvenile offenders.

**The April 16 Meeting and its Immediate Follow-up**

25.     On April 9, 2001, Cindy Ayers and Brenda Wright (of DFS) sent a memo to sheriff's departments, DFS and juvenile offices entitled, "Re Heartland Communities," inviting them to a meeting scheduled for April 16 at the Shelbyville courthouse to "share experiences regarding interactions with Heartland Communities."  Ayers sent the memo to the sheriffs' offices in Knox, Lewis and Shelby Counties, DFS officials in those three counties, the DFS Out of Home Investigation Unit ("OHI"), to her subordinates, and Waddle.   This meeting was planned weeks before the manure investigation began.

26.     On April 16, 2001 at 1:30 p.m., the meeting set up by Ayers and Wright at the Shelbyville courthouse to discuss Heartland was attended by ten or twelve state and local officials.  Cindy Ayers, Mike Waddle, Pam McGowan and Donna Rohrbach of DFS, Shelby County Prosecutor Steve Raymond, and representatives of the DFS Area 2 office were present.

27.     The meeting lasted approximately one and one-half hours.  There was some

discussion about seeking injunctive relief with respect to Heartland.  One of the purposes for

obtaining injunctive relief would be to force Heartland to "cease operations."  There was

discussion at the meeting that Heartland was an unlicensed facility, and that normal remedies

that could be used to "manage" a licensed facility would not be available.

28.     Waddle and Ayers left the April 16 meeting with the understanding that there was

an unwritten agreement that the defendants would try to share information regarding how to

manage Heartland.  No one contacted Heartland after the meeting to tell them these issues were

being discussed or to seek their input.

29.     Waddle participated in a at least one additional meeting, in either April or May,

2001, with Jerrie Jacobs-Kenner, Donna Rohrbach, Brenda Wright and Pam McGowan of DFS.

The focus of the meeting was on the ability and competence level of DFS investigator Tim

Carter, who had been generally assigned to conduct DFS investigations at Heartland.  Carter was

not informed of or invited to the meeting.  Following this initial meeting, the defendants decided

that Tim Carter needed to be removed as the exclusive Heartland investigator because he was

viewed as having a fair disposition toward Heartland who would not be critical enough to be

reliably useful in the effort to take over Heartland or shut it down.

30.     Waddle had multiple conversations with Ayers, other defendants and others

beginning in the Spring of 2001 about what remedies might be available if Heartland would not

behave the way he wanted it to behave.  Because they believed there was no direct remedy

against the school, they concluded that the only way to control the school was through

"removal."  Accordingly, after the April 16 meeting, they began a practice of gathering and

creating negative information about Heartland.

31.     Several other meetings were held during the next few weeks which, in addition to

Waddle, Ayers, and McGowan, included defendants Jacobs-Kenner, White, Abernathy, Rohrbach, James Harrison of DFS, and others.  During the course of these meetings, a series of "special rules" was devised that would be utilized in all future Heartland abuse investigations. These rules included, but were not limited to, the following:  (a) Carter's involvement would be limited, and his conclusions would be subject to approval by McGowan, his supervisor; (b) all abuse and neglect investigations would be conducted utilizing a joint investigation approach with Waddle, Ayers, DFS, and local law enforcement all involved; (c) all information regarding Heartland investigations, including confidential information in DFS files, would on request be shared with juvenile officers and law enforcement officers even though it would be contrary to law or DFS practice to share it; and (d) defendants would publicly disseminate confidential, private, and embarrassing facts and information about Heartland staff and children utilizing the news media and other public venues, even though in Missouri, various practices and policies, some of them mandated by statute, preclude the public dissemination of such information, particularly when allegations of child abuse are involved, but this did not constrain the defendants in their campaign to bring about the closure of Heartland.

32.     Between April and early May of 2001, the defendants continued to hold meetings and exchange negative information about Heartland.  They eventually arrived at a clear strategy and common purpose to deal with Heartland, which was to damage, disrupt and/or destroy the Heartland community by any means necessary.  The defendants formed a conspiracy with this as a common purpose.

**The Manure Investigation**

33.     In late April of 2001, Lewis County Sheriff David Parrish heard a rumor that Heartland students were being exposed to a punishment that involved standing in a manure basin

and shoveling manure.  Parrish heard an exaggerated version of the so-called manure punishment and immediately made a DFS hotline call.  This offered the defendants their first opportunity to put their strategy into use.  The defendants, assisted by Parrish and members of his staff, launched their investigation into the manure allegations on April 30, 2001.  In what would become a repeated and carefully orchestrated investigative strategy, the investigative team engaged in the following conduct:

(a)    Unlawfully seizing a number of juveniles for purposes of interrogating them to obtain information that they could use to damage Heartland;

(b)    Unlawfully detaining the juveniles for investigative purposes without attempting to contact their parents, or allowing Heartland staff members to be present;

(c)    Unlawfully interrogating the juveniles about sensitive, personal information, such as their criminal histories and the reasons they came to Heartland;

(d)    Unlawfully interrogating the juveniles about their religious views, the Bible teaching that they heard at Heartland, making statements and asking questions that implied that the interrogators disapproved of the religious teachings at Heartland;

(e)    Holding the juveniles forcibly, against their will;

(f)    At the conclusion of the interrogation of the juveniles, contacting their parents advising the parents that their child was an apparent abuse victim and strongly recommending to the parents that they should withdraw their child from Heartland;

(g)    In concert with the other defendants, refusing to allow counsel for the detainees to be present for their interrogations, and on at least one occasion turning away counsel who was present prior to the interrogation and refusing to allow him to be present.

**The May 9, 2001 Meeting**

34.     On May 9, 2001, a meeting was held among local DFS and Juvenile Court staff from the 2nd and 41st Judicial Circuit, and Central DFS staff and OHI, to discuss Heartland. Waddle, Ayers, Rohrbach, Jacobs-Kenner, Anita Williams and Abernathy were present.  Again, there was discussion about obtaining an injunction against Heartland.  Injunctive relief was discussed because Ayers and others thought the facility was growing too fast and that they needed to slow down or put a stop to children coming into the facility.  One of the purposes of obtaining an injunction would be to stop any new children from being placed at Heartland.

35.     On May 10, 2001, at the request of DFS, Heartland permitted DFS to interview 10% of Heartland students to determine if any had been abused.  No adverse finding was reported.

**The Manure Criminal Charges**

36.     On June 26, 2001, Lewis County Prosecutor DeCoster filed criminal felony child abuse charges against five Heartland staff members for the manure incidents, all of which have now been disposed of, either by jury acquittals or dismissals.

37.     The entire police report was placed in the court file, and was open to the press and the public.  It included information identifying the juveniles involved in the manure incidents and their parents, including their addresses and telephone numbers, as well as highly personal and confidential information regarding their backgrounds and why they were placed at Heartland.

**The Defendants' Initial Exploration of Mass Removal**

38.     On June 28, 2001, Waddle called Jacobs-Kenner and White of DFS to discuss the possibility of using emergency protective custody to take all of the students out of Heartland, or

14

alternatively seeking the help of local prosecutors to file an injunction to close the school. During this call, they discussed protective custody, logistics, and staffing at Truman State University.

39.     At approximately the same time, Waddle contacted Sheriff Parrish to ask him to speak with prosecutor Jake DeCoster about seeking some type of injunctive relief to close Heartland.  Parrish did speak with DeCoster about the issue and DeCoster declined to pursue it.

40.     At no time up to this point had Waddle ever told any official at Heartland that he was contemplating a mass removal.  On Friday, June 29, 2001, Waddle called the Lewis County Sheriff's Office and requested that a copy of the probable cause statement from the manure investigation be faxed to him.

41.     Sometime on Friday, June 29, Waddle had another phone conference with Jacobs-Kenner and/or White of DFS in which he told them that local prosecutors would not file for an injunction.  Waddle then expressed his desire to prevent the five staff who had been charged from having access to children.  These five staff members had been having contact with the children since Waddle conducted his investigation in early May; he had no new information about the allegations; and no bond conditions had been placed on the staff members prohibiting them from having contact with children.  The decision to consider mass removal if Heartland did not agree to remove the staff members was prompted not by legitimate concerns for the safety of the children, but by the defendants' desire to manage and control the Heartland community.

42.     On Monday, July 2, 2001, Waddle's counsel, Rickey Roberts faxed a letter to Heartland's outside counsel, Steve Porter, requesting a list of all children currently residing at Heartland.  The letter concluded that a "prompt response to this request is requested and may avoid additional action by these agencies."  This was the first request made to Heartland by

Waddle's office for information regarding the children.  However, at 9:35 a.m. on that very morning he had already obtained search warrants to be served on Heartland for that information. Waddle gave Heartland no opportunity to respond to his demand letter of July 2 before obtaining and executing the search warrants.  Judge Steele issued the search warrants on July 2 based on information provided by Waddle that was either false or materially incomplete.

43.     On July 3, 2001, a hearing was held before Judge Steele on Heartland's motion to quash the warrants as unlawfully issued.  Mr. Roberts, Waddle's counsel, admitted at the hearing that Sheriff Parrish's unredacted investigative report was included in the public court file with the manure charges.  However, no effort was made by state or local officials to remove the confidential information from the court file until Heartland asked for and obtained an order that it be removed.

**The July 3 Letter to the Parents**

44.     On Tuesday, July 3, 2001, Waddle and Jacobs-Kenner of DFS, using the records seized from Heartland pursuant to the search warrant, sent a letter to all Heartland parents telling them Heartland was an "injurious environment" for their children:

Dear Parent/Legal Custodian:

We, the undersigned, [as] the representatives of the 2nd Judicial Circuit and the Missouri Division of Family Services, are sending you this letter to provide you with information regarding your child.  As a parent of a child placed at Heartland Christian Academy, you have the right to know and it is our obligation to inform you of recent developments that may indicate that your child is residing in an environment which could be injurious to his/her welfare.

Recently, there has been a coinvestigation of child abuse/neglect allegations of children in placement at Heartland Christian Academy by the Lewis County Sheriff's Department, Knox County Sheriff's Department, the Juvenile Office, and the Missouri Division of Family Services.  Based upon information from this investigation, the Lewis County Prosecuting Attorney has filed 68 felony criminal child endangerment charges against five employees of the Heartland facility.

The Juvenile Office and the Missouri Division of Family Services have been attempting to work in cooperation with Heartland to ensure that the program is providing a safe living environment for all children in their care.  To date, we have been unable to get assurances from Heartland staff that they will take corrective action regarding inappropriate forms of discipline and regarding removing the staff that have current criminal charges pending against them.  As a result, the Juvenile Office is currently contemplating juvenile court intervention to ensure that no children will reside at this facility in an injurious environment.

We know that as a concerned parent, you will want to become personally involved in ensuring the safety of your child.  If you need verification of these charges, which may indicate your child is in an injurious environment, the documentation of the charges and probable cause report are public record at the Lewis County Associate Circuit Court.

 Should you have any questions, you may [sic] 660-665-4224.

Sincerely,

| Michael Waddle | Jerrie Jacobs-Kenner |
|---|---|
| Chief Juvenile Officer | Deputy Director, Children Services |
| 2nd Judicial Circuit | Division of Family Services |

The letter encouraged the parents to review the probable cause report filed in the manure cases for more information about Heartland and its students.  Prior to sending out the letter, Waddle obtained a copy of the charges and the probable cause report from either Parrish's office or the court clerk.  Waddle and Jacobs-Kenner both knew that the police report contained confidential and highly sensitive information about each juvenile including their names, their parents' names and addresses, criminal history information, and other personal information about each juvenile.  Calling this information to the attention of the parents and the news media was a carefully calculated and unlawful tactic designed to publicly humiliate Heartland students and intimidate parents of Heartland children and motivate them to remove their children from the program.

**Waddle's July 3 E-Mail to Juvenile Officers**

45.     Also on July 3, in addition to his threatening communication to the parents, Waddle at 8:39 a.m. sent an e-mail to all juvenile officers in the state urging them to remove any

children they had placed at Heartland.  The e-mail reads in part:

> I encourage you to make an immediate decision as to whether you have any liability leaving a youth under your court's jurisdiction in this unlicensed facility.  I personally believe that you do and should remove any youth you have placed there immediately.

Waddle's intent in sending the e-mail was for the other juvenile officers to remove from Heartland any juveniles that they had placed at the facility.  Ayers received Waddle's e-mail and expressed no disagreement with its recommendations.

### Waddle's July 3 Demand Letter to Heartland

46.     Also on July 3, 2001, Waddle faxed a letter to Heartland demanding that the charged staff members be "removed from any programming or personal contact with juvenile residents at your facility" and that the Juvenile Office have a mechanism to "monitor" those persons.  The letter threatened to remove all of the children from Heartland if Waddle's demands were not met.

### Ayers' July 3 Filing of Petition for No Contact By Manure Defendants

47.     Defendant Ayers, the Juvenile Officer of the 41st Judicial Circuit, was following Waddle's lead in dealing with Heartland during the week of July 2, 2001.  On July 3, 2001, Ayers filed a petition in the Juvenile Court of Shelby County in which she alleged that any juvenile residing at Heartland in Shelby County was in need of care and treatment and without proper care, custody and control because of the filing of the manure charges and because, "[d]espite requests, HCA has failed or refused to provide identifying information on the children at the facility."

### Waddle's Demand to Monitor Heartland Church Services

48.     On July 5, 2001, Waddle sent another letter to Heartland's counsel reiterating his request that charged staff members have no contact whatsoever with juveniles at Heartland.

According to Waddle, this "no contact" restriction would prohibit the charged staff members from attending church services with the juveniles.  On July 6, 2001, Waddle stated his intent to monitor the church services at Heartland.  During July, Waddle sent several staff members to monitor church services at Heartland.  These included Chief Deputy Juvenile Officer Jeff Hall, a defendant herein.  If Heartland had refused to allow juvenile office staff to monitor the church services, he would have made application to the court for a mass removal.

## Ayers' July 6 No Contact Order

49.     Ayers also made her intentions clear regarding Heartland on July 6, 2001.  She arrived at Heartland that afternoon, unannounced, accompanied by several DFS employees, their sole purpose being to identify the children living in the household of Eric Kiepke, a Heartland staff member and one of the individuals charged in the manure incidents.  After Ayers left Heartland, she contacted Judge Grimm and obtained by telephone an *ex parte* order that there be no contact between any children at Heartland and not only Eric Kiepke, but all five of the defendants charged in the manure case.  This *ex parte* "no contact" order issued by Judge Grimm was based on material misrepresentations or omissions by Ayers with respect to the current circumstances surrounding the manure discipline.  Ayers sent an e-mail to Waddle that afternoon.  The e-mail stated:

> Had a little set-to with Charlie tonight.  We went out about Eric Kiepke, and Charlie indicated that they had never been requested for the kids to be removed from the Kiepke home. . . .  He indicated he would obey a court order -- SO HE HAS ONE!  FYI.

## Ayers' July 6 Letter Demanding Removal of J.J.

50.     Also on July 6, 2001, because she understood that the parent of J.J., one of the juveniles who had been involved in the manure discipline, lived in Shelby County, Ayers wrote a letter to his mother demanding that she remove her child from Heartland.  Ayers made this

demand even though she was aware that the manure discipline was not ongoing.  Her letter concluded with the threat, "[i]f you are unwilling to intervene and remove your child from this facility then I will file a petition in the Juvenile Court of Shelby County, and I will request an order removing [him] from the Heartland facility.  In that event, future placement decisions would be made by the Division of Family Services and the Shelby County Juvenile Court."  The child was not under the jurisdiction of the juvenile court at the time Ayers made this demand; he did not even reside in Shelby County.  The letter was hand delivered by an employee of DFS.  J.J.'s mother removed her son from Heartland.

**Ayers Joins DFS and Waddle in Plans for Mass Removal**

51.     On or about July 6, 2001, Christine White, acting on her own behalf and on behalf of the other DFS defendants, called defendant Ayers and discussed removing all of the students from Heartland.  Later in the afternoon of July 6, Ayers sent an e-mail to prosecutor Steve Raymond to update him on her activities with respect to Heartland.  In the e-mail, she referred to the "subpoena and petition" she had filed, and also referred to a discussion with DFS about "taking all the kids" out of Heartland and discussing where they could be housed.  The e-mail concluded, "I talked with Kyle [Kendrick of DFS] and he has some ideas about housing - but the armory looks good."  She was referring to housing Heartland students in an armory if they were removed.  The e-mail further stated, "Tammy [Shoemaker], please call Chuck Wood [county commissioner in Shelby County] on Monday and give him a heads up that we may need a bus, housing, etc."

52.     No mass removal occurred on Monday, July 9.  Waddle decided not to move forward with protective custody at that time because Heartland had capitulated at least temporarily to his ultimatums and there was a meeting scheduled for July 12.

**The July 12ᵗʰ Meeting**

53.     On July 12, 2001, a meeting was held at Heartland involving Charles Sharpe, Dave Melton, Waddle, Rohrbach, Harrison and other DFS officials.  The purpose of the meeting, ostensibly, was to allow Waddle and the DFS participants an opportunity to talk with Sharpe and Melton to determine if any of the multiple issues could be resolved.  At the meeting, corporal discipline was discussed extensively, and Heartland sought, and felt they had obtained, some views from both Waddle and DFS regarding their concerns over the use of corporal discipline, as well as other current disciplinary practices at Heartland.  In fact, the meeting proved to be nothing more than a ruse by Waddle and DFS to attempt to obtain more negative information about the Heartland program that could eventually be used in their campaign to close the facility.

54.     In furtherance of this goal, at the end of the July 12 meeting, Rohrbach approached Heartland's attorney, Dave Melton regarding the possibility of interviewing Charles Sharpe the following day in relationship to the B.A. and S.D. investigations.  Melton was led to believe that Sharpe's cooperation might result in his eventual exoneration of the charges. Unknown to Melton was the fact that DFS had *already* placed Sharpe's name in the State's central registry and had already determined that defendant Engelhardt, on behalf of himself and the other DFS defendants, was going to make a probable cause finding against him with regard to both the S.D. and B.A. cases.  Melton was also unaware that the DFS defendants were actively encouraging the prosecutors in both Knox and Shelby counties to bring criminal charges against Sharpe, as well as the other three staff members who allegedly participated in the discipline of both S.D. and B.A.  The interview, which took place on July 13, was not conducted in a good faith effort to objectively investigate the charges but was being done solely for the purpose of accumulating information that DFS hoped would eventually be used in a criminal prosecution of

Sharpe.  The DFS investigation relating to the B.A. and S.D. abuse allegations was assigned to Rick Engelhardt, because the DFS defendants knew that Engelhardt, unlike Carter, could be relied upon to substantiate spurious allegations against Heartland personnel.  Contrary to normal practice and policy, the supervisor of the OHI Unit, defendant Rohrbach, became directly involved in the investigation.  Engelhardt eventually substantiated the allegations against all four alleged perpetrators.  All four alleged perpetrators were eventually exonerated in a judicial review that took place in 2003.  The B.A. and S.D. cases were significant because they were the first in a series of adverse child abuse findings by the DFS defendants against various Heartland staff members.  These substantiated findings would become an important tool for the defendants in their ongoing campaign against Heartland.  Because Heartland founder and director Charles Sharpe was implicated, Waddle, Hall, Ayers and the DFS defendants would repeatedly point to these findings as indicia of large-scale child abuse at Heartland.

**The Lull After The July 12 Meeting**

55.     Between the July 12th meeting and late October, Heartland enjoyed a brief period of relative calm with Waddle, Ayers, and the DFS defendants.  During that time period, however, the defendants continued to meet, communicate and surreptitiously lay the groundwork for their next effort to close Heartland.

56.     Waddle agreed to send a letter to parents and juvenile authorities indicating there had been favorable progress and many of his concerns had been alleviated.  Ayers discussed what had taken place at the meeting with James Harrison of DFS when she returned from her vacation on or about July 17.  Based on the outcome of the meeting, she did not pursue mass removal of the students.

57.     However, on September 4, 2001, Waddle sent a memo to Ayers regarding his

attempts to set up a meeting with the Heartland ombudsman.  According to Waddle's letter,

> I'm of the opinion that if we can't get the meeting scheduled, then I am unable to ensure the safety of the children residing at Heartland and might once again be in a position of needing to seek further court action to do so.

Waddle was once again referring to a mass removal, and Ayers understood that he meant he might take action to remove the children at Heartland.

58.    Also on September 4, 2001, Waddle wrote to White of DFS, saying it was good to see her at the Lake on Friday, that they had tentatively set up a meeting with ombudsman Carrie Abbott and that she should send someone from her office.  Also, Waddle requested that White provide him with all Heartland hotline reports DFS had investigated since the manure incident.

**Waddle's Request to Ayers to Lead Charge Against the Christians**

59.    On September 6, 2001, Waddle e-mailed Ayers, asking her again about her availability to attend a meeting with the ombudsman.  Waddle also asked in his September 6 e-mail to Ayers if she was going to the Administrative Concerns Meeting of juvenile office administrators in October.  In a "P.S.", he made the following request:

> I wish someone would ask for one of the agenda items to be faith based programs, but I do not want it to be me.  I would rather be available for input than be on the record, at least at this point, as leading a charge against the Christians.  Obviously I use that word rather loosely.

Waddle intended, and Ayers understood, that this was a reference to Heartland.  It has at all relevant times been Waddle's belief that no program should operate in Missouri if it is not licensed.  Waddle had communicated this opinion to Ayers and that it related to faith-based institutions such as Heartland because those were the only programs that were exempt from licensure.

**Investigation of O.M. and J.K. Matters and the Prelude to the Mass Removal**

60.    On or about October 20, 2001, two Heartland students, J.K. and J.B., ran away

from Heartland and were taken into juvenile custody and taken to Kirksville to the 2nd Judicial

Circuit's juvenile detention facility, overseen by Waddle.  Neither J.K. nor J.B. was suspected of

criminal offenses.  Over the next several days, however, they were interrogated by Waddle's

staff members, under Waddle's direction.  Both juveniles were asked questions about their

treatment at Heartland.  J.K. told the investigators about an incident that had occurred several

weeks previous wherein he had received minor cuts on his hands during an incident when he had

broken a mirror and then had an encounter with a junior Heartland staff member, Nathan Mayes.

61.     J.K. and J.B. also told Waddle's investigators a story about an incident involving

O.M., a Heartland student who had suffered an ear injury after he was accidentally struck by a

staff member during the course of an altercation that O.M. had instigated.

62.     After obtaining the information from J.K. and J.B., Waddle believed he had

sufficient evidence to instigate the long-anticipated mass removal of boarding students from

Heartland, and, with full cooperation and assistance from the DFS defendants, he began to lay

the groundwork for this event.

63.     On October 22, 2001, the Juvenile Office and Waddle complied with the

agreement concerning interviews with juveniles that had been reached with Heartland in

September by calling the Heartland ombudsman to let her know they planned to interview

students. Waddle and others called Ms. Abbott, the Heartland ombudsman, at 10:00 a.m. and

reached her at 11:00 a.m.  They told her they were going to begin interviews in one hour.

Despite the short notice, Heartland arranged for a Kirksville attorney to observe Waddle and his

staff conduct the interviews through a two-way mirror.

64.     Waddle and his staff learned of the J.K. and O.M. incidents during the interviews

of the runaways in the early afternoon of Monday, October 22.  After his interview with J.K.,

Waddle called J.K.'s mother, plaintiff Elyese Anderson.  Ms. Anderson informed Waddle and his

staff that she did not believe her son had been abused at Heartland and that he needed to stay at

Heartland.  She warned Waddle that if her son was released from Heartland he was likely to

commit crimes of violence.  Waddle's response to this was to file a petition in juvenile court to

have J.K. taken into protective custody and to threaten Ms. Anderson with loss of custody if she

refused Waddle's demands to have J.K. removed from Heartland.  Fearful of Waddle and his

threats, Anderson traveled to Missouri and picked up J.K. and took him back to Texas, where he

proceeded to commit a crime of violence.  He is currently serving a sentence in solitary

confinement in the Texas Department of Corrections.  As to J.B., Waddle agreed to release him

at that point back to Heartland.

65.     Waddle instructed defendant Hall to coordinate with DFS and law enforcement

and to arrange to interview four juveniles.  Hall understood that one of the juveniles was the

alleged victim and the other three were only witnesses.

66.     On Tuesday, October 23, 2001, Rick Hill of DFS sent a fax to Jeff Hall attaching

a copy of the manure investigation report.  This would be used by Waddle and Ayers to justify

the mass removal of Heartland students on October 30.

67.     Also on October 23, according to Cindy Ayers' Report to the Court filed on

November 2, 2001, juvenile office personnel from the 41st Judicial Circuit and the 2nd Judicial

Circuit "met and agreed" that all of the boarding students should be removed from Heartland.

68.     Also on October 23, Waddle made an official hotline call to DFS alleging that

both J.K. and O.M. had been abused.  This allowed the DFS defendants to become more

involved in the process.  Defendant Rohrbach assigned Rick Engelhardt to investigate the J.K.

and O.M. cases rather than Tim Carter.  She and the other DFS defendants were confident that

Engelhardt would substantiate spurious abuse allegations against Heartland personnel; they were not as confident that Carter would.

69.     The next day, Wednesday, October 24, 2001, Waddle left for a conference at the Lake of the Ozarks where he stayed until Friday, October 26, 2001.   Before he left, on the morning of the 24th, he had a telephone conversation with the DFS investigator, defendant Engelhardt, who called Waddle in response to Waddle's hotline call late the night before.  They agreed that the O.M. and J.K. investigations were to be conducted by a team of Waddle's deputies, defendant Jeff Hall, law enforcement and DFS.  The members convened as a team, decided on how to conduct the investigation as a team, and carried through and made decisions in the course of the investigation as a team.

70.     Hall met with the rest of the co-investigation team, DFS investigator Englehardt and law enforcement, on Wednesday, October 24 to discuss arrangements to interview the four juveniles.  The team did not make any effort to notify any of the parents of the juveniles during that twenty-four hour period that they planned to conduct these interviews.

**The October 25 Investigative Detentions**

71.     On October 25, 2001, Heartland students O.M., C.T., J.B. and L.T. were all taken into protective custody by law enforcement, defendant Hall and defendant Engelhardt and were interviewed at the Lewis County Sheriff's Office.  When the co-investigation team, on their way to Heartland, called Carrie Abbott to inform her of the interviews, they did not tell her they were taking the boys off campus, even though they had already decided to do so the day before.  The four boys removed from Heartland were taken into "protective custody" for purposes of an interview.  While they were at the Sheriff's Office, they were not free to leave.  The co-

investigative team did not call their parents before the interviews.  The decision to interview the

boys at the Sheriff's Office was communicated to Heartland by "the team."

72.     After the interviews and while the team was still holding the boys at the sheriff's

office, at approximately 6:00 p.m., the team contacted Heartland's outside counsel in Hannibal,

Steve Porter, and told him that staff members ("witnesses" and "suspects") needed to be

produced for interviews and Jason Flood needed to be removed from the boys' dormitory.

73.     David Melton called the team back at around 9:00 p.m. and told the team that he

was unable to respond at that time because he needed to consult with the head of the ministry,

who was out of town.  Melton was concerned as to why the authorities were holding the boys

and also expressed his concern that no counsel had been allowed to observe the interrogations of

the boys.

74.     Throughout the afternoon and evening of October 25, the boys continued to be

"detained," until the team determined whether Heartland would comply with their conditions.

Late in the evening, after 9:00 p.m., C.T., L.T. and J.B. were returned to Heartland, because the

team believed they could be safely returned even without Heartland's agreement to comply with

conditions that had been demanded.

**Preparing for the October 30, 2001 Mass Removal**

75.     Defendants had determined, in meetings occurring in the Spring and Summer of

2001, that the only way to exercise control over Heartland itself was through the removal of

children from Heartland.  However, the specific plans for the mass removal of children that

would occur on October 30, 2001 began approximately a week earlier, with Waddle and Ayers

agreeing on October 23, 2001 that the removal should take place.

76.     Both Waddle and Ayers, in concert with the DFS defendants, obtained the

issuance of removal orders based on *ex parte* presentations to their juvenile judges that were either false or materially incomplete.  Ayers based her petitions on the petitions that Waddle prepared and had sent to her.  None of the petitions and orders prepared by Ayers was legally effective until after the mass removal had already occurred.

77.    The defendants agreed no later than October 29, 2001 that there would be no hearings for most of the students who would be removed, since their parents would be allowed to pick them up, and that would occur as soon after they were removed as practicable.  As the children were retrieved by their parents, the petitions would be withdrawn and the cases dismissed.

78.    The defendants had conspired to use the investigations into the OM and KJ matters as a pretext for the mass removal.  Even though their investigation into those matters would not be complete until December 31, 2001, and even though the DFS defendants through defendant Engelhardt would not request interviews of the alleged perpetrators until November 1, 2001, the DFS defendants assured defendants Waddle and Hall on or prior to October 26 that their investigation would result in findings against Heartland staff members.

**The October 30, 2001 Mass Removal**

79.    On October 30, 2001, the defendants unlawfully seized and detained, or unlawfully caused the seizure and detention of, approximately 115 Heartland students, including the plaintiff children and children of the plaintiff parents.  While the children were in custody, and before they were released to their parents, defendants Waddle and Ayers, their subordinates and those acting in concert with them, threatened plaintiff parents and children that if the children were returned to Heartland they would again be removed, the parents would face loss of their parental rights, the children would be placed in the custody of others, and the parents would

face charges of criminal neglect.  Prior to having their children released to them, many of the parents (including some of the plaintiff parents) were required to promise not to return their children to Heartland.  None of the children of the plaintiff parents had been abused and none of them were in imminent danger of being abused, such that their being removed from Heartland was justified.  All of the defendants were engaged in planning, directing, and/or executing the unlawful seizure and detention of students as described herein.  White, Harrison and other DFS personnel traveled to Kirksville, Missouri on October 30, 2001 to help in "processing" the students who were confined and in returning them to their parents instead of following through on the petitions that had been filed.

80.     As of October 30, 2001, there were about 220 children in attendance at HCA; 120 were program (residential) children.  Of these, 115 were removed and 32 never returned.

**The November 2, 2001 Protective Custody "Hearings"**

81.     72-hour hearings were scheduled to be held before the juvenile judges for the 2nd and 41st judicial circuits, but they did not occur because, pursuant to the agreement reached between defendants, the respective juvenile offices dismissed the petitions.

82.     Within a one week period, defendants seized, without any prior notice or a hearing, 115 Heartland boarding students, confined them against their will, threatened their parents with criminal action and impairment of their parental rights if they returned the students to Heartland, and then, when faced with a hearing, dismissed the cases involving the students before anyone other than the Juvenile Officer could be heard.  No defendant could have reasonably believed that there was an emergency on October 30 requiring such *ex parte* action.

**Defendants' Media Advisory and November 6 Press Conference and Press Release**

83.     On Thursday, November 1, 2001, Waddle issued a "Media Advisory" regarding

the removal.  The Media Advisory acknowledged that under "usual circumstances" public comment about pending juvenile cases "would not be appropriate."  Waddle claimed in the media advisory that "every effort was made to avoid removing any children from Heartland." He then went on to discuss the details of the pending, unadjudicated DFS reports regarding Heartland staff members, referring to one charge as being against a "senior administrator" of Heartland.

84.     On information and belief, Ayers, Hall and the DFS defendants, including but not limited to Martin, Cross, Jacobs-Kenner, White and Abernathy, were aware of Waddle's Media Advisory, press release and press conference of early November 2001 and participated in the preparation of them and/or were supportive of them.  Waddle and the aforedescribed defendants were unhappy with the tone and content of media coverage of the mass removal, believing that it placed them and their agencies in a bad light.  In an attempt to damage Heartland's credibility, the defendants planned a news media event/press conference for November 6, 2001. Attending the press conference were Waddle and Ayers and, at the direction of Cross, Jacobs Kenner and/or Martin, Abernathy also attended.  Members of the press were invited but the general public was not allowed to be present.  Defendants acknowledged in the press release that accompanied the press conference that under usual circumstances, public comment about pending juvenile cases would not be appropriate and would not be made.  There was no exception in the statutes governing confidentiality of juvenile proceedings for disclosure to respond to criticism of a public official.  Defendants asserted in their press release that there were a specific number of substantiated DFS charges against Heartland staff.  The press release contained information obtained through the DFS defendants from confidential DFS investigative records.  Much of the information communicated to the news media through the various news

releases and at the press conference was either false, exaggerated, and/or deliberately designed to invade plaintiffs' privacy.  Much of the information released was information deemed confidential or otherwise not subject to public disclosure by various Missouri statutes, regulations, and the Code of Judicial Ethics.

**The Temporary Restraining Order and Preliminary Injunction**

85.   On November 5, 2001, a hearing was held before the U.S. District Court for the Eastern District of Missouri on Plaintiffs' request for a temporary restraining order.

86.   On November 6, 2001, the Court entered the following temporary restraining order:

> IT IS HEREBY ORDERED that prior to seeking pre-notice or pre-hearing protective custody and removal of any children from the Heartland Academy Community Church, Defendant Michael Waddle, his officers, agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this Order, demonstrate to this Court reasonable cause to believe that the specific juvenile to whom the protective custody is sought is in imminent danger of suffering serious physical harm or threat to life.

87.   On November 14-16, 2001, an evidentiary hearing was held on Plaintiffs' Motion for a Preliminary Injunction.   A Preliminary Injunction was entered on February 7, 2002 and was affirmed by the Eighth Circuit Court of Appeals.  The Preliminary Injunction provided, in pertinent part, as follows:

> Until a full trial on the merits is held in the above-styled action, Defendants Michael Waddle, David Parrish, and Patricia McAfee, their officers, agents, servants, employees, and attorneys and those persons in active concert or participation with them who receive actual notice of this Order are enjoined from seeking or participating in any pre-hearing removal of all boarding children from HCA unless all boarding children at HCA are directly involved in the underlying facts that serve as the basis for such removal.

88.   Between November 6, 2001 and February 7, 2002, the date of Judge Webber's preliminary injunction, a number of the DFS defendants, including but not limited to Martin,

acting individually and in conspiracy with Waddle and Ayers, continued to release private, false, and/or damaging information about Heartland to the public, including sending a letter, signed and sent on or about January 24, 2002 by Department of Social Services Director Dana K. Martin to a Missouri state legislator, falsely stating that a Heartland staff member had pleaded guilty to felony child abuse after beating a child.  Under the direction of either Martin or Hill, this false information was placed in the Central Registry and Hill and others at the Division falsely reported that a probable cause finding had been made against a Heartland staff member. Like the conduct described in Paragraph 84 and elsewhere herein, this conduct was designed to place Heartland in a false light, invade the privacy rights of the Heartland plaintiffs, and continue the process of attempting to disrupt and/or destroy Heartland and interfere with the associational rights of Heartland and its constituents.

**The Permanent Injunction**

89.     From July through September 2003, shortly after the Eighth Circuit Court of Appeals upheld the preliminary injunction, the Court heard approximately 15 days of testimony leading to its May 2004 permanent injunction against defendant Waddle.  In its judgment, the Court found that Waddle and Ayers had violated the family integrity/parental rights of its students and their parents, and the Fourth Amendment rights of its students against unreasonable seizure, and that they had conspired with each other to violate these rights.  In addition, the Court found that Waddle, who it described as a "predator" and as one who provided "perjurious" testimony, had violated the associational rights of the Heartland community.

**Injuries to the Heartland Community and its Members**

90.     As a proximate result of the actions of the defendants: Heartland students and their families, as well as the institutional plaintiffs, have been injured and damaged in that they

have suffered and continue to suffer humiliation, mental anguish, inconvenience, attacks on their dignity, loss of reputation, loss of business relationships, loss of prospective business relationships, attorney fees, travel costs, disruption to the entire Heartland ministry, and many constitutional injuries; parents and their children have suffered interference with their familial relationships, including parent-child relationships, and loss of respect for and authority of the parents, and loss of the children's faith in the ability of their parents to control the well-being of the children; parents and children have suffered post-traumatic stress disorders, and aggravation of pre-existing disorders; parents and children have suffered interference with continuity of and opportunity for treatment, education and therapy of the children; parents and children have suffered loss of trust in lawful authority, anxiety about the personal security of themselves and others, and being forced to witness the suffering of other children; children have been forced to associate school and home with terror; plaintiffs have been subjected to disrespect and contempt for the plaintiffs' religion by defendants making their religious sanctuary a place of danger and terror; plaintiffs have been subjected to the defendants' interference with the moral development of the children; children have been alienated from their caregivers and parents; and children have been unlawfully seized and recklessly endangered by defendants.

91.    The conduct of defendants, as described herein, shocks the conscience, constitutes outrageous conduct, and was done intentionally, willfully, maliciously and/or with reckless indifference to the rights of plaintiffs, thereby warranting awards of punitive or exemplary damages in amounts sufficient to punish defendants and deter future similar conduct.

92.    The foregoing averments are incorporated in each of the following counts.

## COUNT I

**Section 1983 Claim Of Students And Parents Against All Defendants For Violation Of Their Family Integrity Rights/Parental Rights Under The U.S. Constitution**

93.     The preceding paragraphs 1-92 are incorporated herein by reference.

94.     Defendants violated the federal constitutional rights of plaintiff students and their parents to be free from interference with the rights of parents, guardians and families to direct the upbringing and education of their children, under the U.S. Constitution.

## COUNT II

**Section 1983 Claim Of Students Against All Defendants For Violation Of Their Rights Against Unreasonable Seizure Under The U.S. Constitution**

95.     The preceding paragraphs 1-94 are incorporated herein by reference.

96.     During October and early November 2001, defendants violated the federal constitutional rights of plaintiff students to be free from unreasonable seizures under the Fourth and Fourteenth Amendments to the U.S. Constitution, and their rights not to be deprived of their liberty without due process of law and the equal protection of the law under the Fifth and Fourteenth Amendments to the U.S. Constitution.

## COUNT III

**Section 1983 Claim Of Students And Parents Against All Defendants For Violation Of Their Freedom Of Association Rights Under The U.S. Constitution**

97.     The preceding paragraphs 1-96 are incorporated herein by reference.

98.     Defendants violated the federal constitutional rights of plaintiff students and their parents to associate with each other and within the Heartland community, as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution.

## COUNT IV

**Section 1983 Claim Of Students And Parents Against All Defendants For Violation Of Their Free Speech And Religious Freedom Rights Under The U.S. Constitution**

99.     The preceding paragraphs 1-98 are incorporated herein by reference.

100.     Defendants violated the federal constitutional rights of the plaintiff students and their parents to be free from interference with their rights to religious liberty and free speech under the First and Fourteenth Amendments to the U.S. Constitution.  Defendants have unconstitutionally discriminated against the plaintiff students and their parents, because of their religious viewpoint, and have unconstitutionally discriminated against them, in that they have lacked neutrality and demonstrated hostility toward the sincerely-held religious beliefs and practices of the plaintiff students and their parents.  This policy and custom of the defendants has also had the primary purpose and effect of inhibiting the plaintiffs' religious beliefs and activities, and has unconstitutionally entangled the defendants in the religious beliefs and practices of the plaintiffs.

101.     The actions, policy and custom of the defendants toward the plaintiffs evidence not neutrality but hostility towards the religious beliefs and practices of the plaintiffs; in the perception of an informed and objective observer, send a message of disapproval of the religious beliefs and practices of the plaintiffs; discriminate against religion, favor non-religion, and are thereby injurious to the plaintiffs and their religious beliefs and practices; and discriminate among religions by singling out plaintiffs and their religious beliefs and practices.

## COUNT V

**Section 1983 Claim Of Heartland Plaintiffs Against DFS Defendants For Violation Of Their Freedom Of Association Rights Under The U.S. Constitution**

102.     The preceding paragraphs 1-101 are incorporated herein by reference.

103.    The DFS defendants, individually and in concert with the other

defendants,violated the federal constitutional rights of the members of the Heartland community,

including the Heartland plaintiffs, to associate within the Heartland community, as guaranteed by

the First and Fourteenth Amendments to the U.S. Constitution.

## COUNT VI

**Section 1983 Claim Of Heartland Plaintiffs Against DFS Defendants For Violation Of Their Free Speech And Religious Freedom Rights Under The U.S. Constitution**

104.    The preceding paragraphs 1-103 are incorporated herein by reference.

105.    Defendants have violated the federal constitutional rights of the Heartland

plaintiffs to be free from interference with their rights to religious liberty and free speech under

the First and Fourteenth Amendments to the U.S. Constitution.  Defendants have

unconstitutionally discriminated against the plaintiffs because of their religious viewpoint, and

have unconstitutionally discriminated against them, in that they have lacked neutrality and

demonstrated hostility toward the sincerely-held religious beliefs and practices of the Heartland

plaintiffs.  This policy and custom of the defendants has also had the primary purpose and effect

of inhibiting the plaintiffs' religious beliefs and activities, and has unconstitutionally entangled

the defendants in the religious beliefs and practices of the plaintiffs.

106.    The actions, policy and custom of the defendants toward the plaintiffs evidence

not neutrality but hostility towards the religious beliefs and practices of the plaintiffs; in the

perception of an informed and objective observer, send a message of disapproval of the religious

beliefs and practices of the plaintiffs; discriminate against religion, favor non-religion, and are

thereby injurious to the plaintiffs and their religious beliefs and practices; and discriminate

among religions by singling out plaintiffs and their religious beliefs and practices.

<u>**COUNT VII**</u>

**State Law Claim Of Students And Parents Against All Defendants For Abuse Of Process—
Protective Custody**

107.     The preceding paragraphs 1-106 are incorporated herein by reference.

108.     In October and early November 2001, the defendants made an illegal, improper

and/or perverted use of process, and/or instigated same, to the extent they requested and obtained

protective custody orders and acted upon them; such use was neither warranted nor authorized by

the process; and defendants had an improper purpose in exercising the use of process, including,

but not limited to, the disruption and destruction of the Heartland community.

<u>**COUNT VIII**</u>

**State Law Claim Of Students Against All Defendants For False Imprisonment**

109.     The preceding paragraphs 1-108 are incorporated herein by reference.

110.     The defendants restrained plaintiff students, or instigated the restraint of plaintiff

students, against their will and without legal justification.

<u>**COUNT IX**</u>

**State Law Claim Of Heartland Plaintiffs Against DFS Defendants For Invasion Of Privacy**

111.     The preceding paragraphs 1-110 are incorporated herein by reference.

112.     The DFS defendants published private facts about the Heartland plaintiffs and

their constituents to a large number of persons, without a grant to the DFS defendants of any

waiver or privilege.  The disclosure made by the DFS defendants was of private matters in which

the public has no legitimate concern, and the disclosures were made in such a way as to bring

shame or humiliation to an individual of ordinary sensibilities.

## RELIEF REQUESTED

WHEREFORE, plaintiffs pray for the following relief:

### Students and Parents

Plaintiff students and parents pray for the following relief against all defendants:

(a)     Actual, compensatory, and nominal damages from the defendants, jointly and severally;

(b)     Punitive damages as allowed by law;

(c)     Costs as provided by law;

(d)     Attorney fees and other expenses as provided by law under 42 U.S.C. § 1988; and

(e)     Such other and further relief as the Court deems appropriate.

### Heartland Plaintiffs

Plaintiffs Heartland Academy Community Church and CNS International Ministries, Inc. pray for the following relief against the DFS defendants:

(a)     Actual, compensatory, and nominal damages from the defendants, jointly and severally;

(b)     Punitive damages as allowed by law;

(c)     Costs as provided by law;

(d)     Attorney fees and other expenses as provided by law under 42 U.S.C. § 1988; and

(e)     Such other and further relief as the Court deems appropriate.

DATED this 7th day of March, 2008.

/s/ Al W. Johnson_____
One of the attorneys for Plaintiffs

Timothy Belz, Esq.  #5381
Ottsen, Mauzé, Leggat & Belz, L.C.
112 South Hanley, 2nd Floor
St. Louis, MO 63105
314/726-2800
Fax 314/863-3821
timothybelz@aol.com

Al W. Johnson, Esq.  #5386
112 South Hanley Road, Suite 200
St. Louis, MO 63105
314/726-6489
Fax 314/726-2821
ajohnson@awj-law.com

**CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2008, I electronically filed Plaintiffs' First Amended Complaint using the CM/ECF system which will send notification of such filing(s) to the following:

Al W. Johnson
ajohnson@awj-law.com

Diane Peters
diane.peters@ago.mo.gov, kimberly.mcgaughey@ago.mo.gov

Christopher J. Quinn
christopher.quinn@ago.mo.gov

Jeannie Desir
jeannie.desir@ago.mo.gov, Shannon.mills@ago.gov

James B. Farnsworth
jim.farnsworth@ago.mo.gov

/s/ Timothy Belz_____
Timothy Belz, Esq.  #5381
Ottsen, Mauzé, Leggat & Belz, L.C.
112 South Hanley, 2nd Floor
St. Louis, MO 63105
314/726-2800
Fax 314/863-3821
timothybelz@aol.com